In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-22-00048-CV**
**IN THE INTEREST OF D.P. AND D.P.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 21-01-00423-CV**

**MEMORANDUM OPINION**

After a bench trial, Appellant (A.L.)[1] ("Alice" or "Respondent") filed an appeal of the trial court's order terminating her parental rights to her three-year-old twins, D.P. ("Donna") and D.P. ("Darren"). We affirm.

Background

On January 12, 2021, the Department of Family and Protective Services ("the Department" or "Petitioner") filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child

---

[1] To protect the identity of the children, we use pseudonyms to refer to the children, their parents, and other family members. *See* Tex. R. App. P. 9.8(b)(2).

Relationship ("the Petition"). The Petition named twins Donna and Darren as children of the suit.[2] Derek was named as Donna's and Darren's father, and Alice as the children's mother. When the Petition was filed, the twins were not yet two-years old.

The Petition was supported by an affidavit from a Child Protective Services ("CPS") worker and representative of the Department. The affidavit stated that, on December 19, 2020, the Department received a referral from a hospital stating that Alice and her boyfriend, Anthony, who brought one-year-old Donna to the emergency room at Texas Children's Hospital-The Woodlands due to the child "breathing weird" while sleeping. Alice reported that Donna's breathing issues began the night before. According to the affidavit, Donna's breathing and heartbeat were stabilized after she was resuscitated at the hospital. The affidavit states that Donna's x-rays showed bilateral rib fractures and other injuries and her mother Alice had no explanation for Donna's injuries and denied she had recently fallen or suffered any injuries. According to the affidavit, Donna's only caregivers outside of

---

[2] The Petition also named Alice's other two children, Leon and Amber, as subjects of the suit, Kirk as Leon's alleged father, and Alex as Amber's alleged father. Amber's case was severed into a different cause number, and a nonsuit for Leon was granted on the Department's motion. At the time of trial, Alice also had another child, five-month-old Andy, and Andy's alleged father is Anthony. The twins, Donna and Darren, were the only two children in the case at the time of the trial, and we discuss the other children and their alleged fathers only when necessary for an understanding of the record.

Alice and Anthony were at the daycare. The affidavit states that due to her injuries, Donna would be transferred to the main campus of Texas Children's Hospital.

According to the affidavit, on December 22, 2020, the Department received another referral after a skeletal survey was done on Donna's twin brother, Darren. The affiant states that it was discovered that Darren also had multiple old bilateral rib fractures and dark colored spots on his abdomen and a few on his left trunk area that were fingertip-sized. Alice had no explanation for the injuries to Darren.

According to the affidavit, a hospital social worker reported that when Donna arrived at the emergency room, she was unresponsive. CPR was performed for nine minutes, and a defibrillator machine was used. After Donna had a pulse, she was intubated and transferred to Texas Children's Hospital in Houston. The hospital social worker reported that Donna had multiple bilateral rib fractures in various stages of healing, and that most of the front and back ribs on both sides of the chest had some level of fracture. Donna also suffered from a laceration and contusions on the liver, and she had contusions in the soft tissue of the brain.

The affidavit states that a doctor at Texas Children's Hospital reported to the Department representative that Donna's brain contusions were hard to assess until more time had passed and that many of Donna's rib fractures were inconsistent with the act of CPR. The doctor told the Department that the nature of the levels of fracture indicated "a strong possibility of abuse[.]" At the time of the affidavit, the

3

doctor did not yet know what caused Donna's cardiac arrest but stated that the medications she was taking would not have caused it and Donna had tested negative for drugs.

The Department representative stated in the affidavit that she and Officer Kennard with the Conroe Police Department met with Alice at the hospital and were able to see Donna. When Officer Kennard interviewed Alice, Alice stated she was having problems with the children's daycare, and she changed daycares in October 2020 after Donna had been taken to the hospital "for limping." According to Alice, she had taken Donna to the doctor on the morning of December 18, 2020, for a follow-up visit relating to "swelling/rash" on her jaw and nose, for which she had been prescribed Amoxicillin. Alice then took Donna to her grandmother's house and Alice ran errands, and then picked Donna back up around 4 p.m. Alice reported that Donna was playing, happy, and eating well, and fell asleep next to Alice and Darren around 9:20 p.m. Donna said that at approximately 10:30 p.m., she asked Anthony to put the twins in their shared crib. Alice told the Officer that around midnight, Alice "jolted" awake and asked Anthony, who was still awake and playing video games, why Donna was making noises breathing. Alice reported that Anthony picked Donna up and she was limp. Alice told the Officer that they took Donna to the hospital.

4

According to the affidavit, when Alice was questioned at the hospital, Alice's explanation of what had transpired did not match medical information obtained by the hospital. Alice denied knowing what happened to Donna, and she said that neither she nor Anthony had anything to do with Donna's injuries.

The affidavit states that Detective Morris with the Conroe Police Department reported that Anthony stated to him that Alice woke up at 10:20 p.m. and asked Anthony to place the children in their crib. According to the affidavit, Anthony stated Alice got up and went to the restroom, and then she stayed up and was on her cell phone that evening.

After a bench trial, the trial court signed a Final Order Affecting the Parent-Child Relationship and Order for Termination and found terminating Alice's parental rights to Donna and Darren would be in their best interest. Under the order, the trial court terminated Alice's rights on two of the predicate statutory grounds that allow a court to terminate a parent's rights.[3] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2). Alice timely appealed.

---

[3] The trial court also terminated the parental rights of Derek, the alleged father of Donna and Darren, but Derek is not a party to this appeal. The trial court also terminated the parental rights of any unknown father of Donna and Darren.

5

Evidence at Trial

Testimony of Alice

Alice testified at trial. Donna and Darren were almost three years old by the time of the trial, and Alice testified that Derek was their father. She testified that she had three other children: Leon (age thirteen), Amber (age eight), and Andy (age five months). Alice testified that she had never been married. According to Alice, she had worked forty hours a week the past two months for a mortgage company where she earned an average monthly gross income of $2500, and prior to that, she worked at a communications company for eight months. She had been living the past two months in an apartment in Harris County with two of her children, Amber and Andy. She testified that Derek, Donna's and Darren's father, was in Louisiana.

Alice testified that her court-ordered plan required her to undergo a psychiatric evaluation, attend parenting classes, participate in parent collaborative group, attend counseling sessions, and to have income and a stable place to reside. Alice denied having a mental health diagnosis or ever using illegal drugs or drugs not prescribed to her. Alice agreed that her visits with the children at her mother's residence were to be supervised, and Alice denied that she ever saw the children there without supervision.

Alice testified that she took Donna to a pediatrician on December 17, 2020, for red patches on her skin and face and a puffy cheek that was diagnosed as cellulitis

and for which Donna received antibiotics. Alice said she brought Donna back on December 18, 2020, for a follow-up visit due to her allergies to some antibiotics. According to Alice, her children stayed at her mother's residence on December 19, 2020, while Alice shopped and then Alice picked them up from her mother's and put Donna down to sleep around 9 p.m. When she put Donna down, Donna was "still kind of groggy from being sick[]" but she went to sleep like she normally did. Alice stated that at that time she was living with all her children and her boyfriend, Anthony. She said she met Anthony online, they lived together from May 2020 through December 2020 or January 2021, she is no longer in a relationship with him, and he is the father of her youngest baby, Andy. Her apartment at that time had two bedrooms, and Donna and Darren shared a crib in Alice's bedroom at the foot of her bed.

Alice stated that around midnight or 1 a.m., she was alerted that Donna was in distress because she "started having this raspy, heavy breathing that wasn't normal." According to Alice, Anthony was sitting in the room playing video games in a chair next to the crib, Donna was "catty-cornered" to him, and Alice jumped out of the bed when she heard Donna having difficulty breathing. When Alice picked Donna up, Donna's body was limp, and the child would not open her eyes. Alice, Anthony, and the children rushed out to take Donna to Texas Children's Hospital in The Woodlands.

According to Alice, when she arrived at the hospital, she told them Donna was not breathing and they instantly took Donna, who was nonresponsive, and performed CPR for ten or fifteen minutes. Alice testified that a heavy man performed the chest compressions with force and at that time Donna weighed around twenty pounds. Alice testified that Donna was admitted instantly as a trauma patient and within ten or fifteen minutes, Alice was informed that CPS was being notified, which surprised Alice because she "do[es]n't abuse any of [her] children."

Alice testified that when she took Donna to the hospital, Donna was not breathing. Alice was told by the hospital that Donna had suffered fractured ribs, and Donna was transferred to Texas Children's Medical Center. Alice agreed that the medical records also showed that Donna had a laceration to her liver. Alice testified that the hospital did a skeletal survey on Darren and she agreed that it was reported to her that he also had rib fractures but of a "different age" than Donna's. Alice did not know whether to believe the medical professionals when they told her that Donna had several healing fractures and an injured liver because it was her "first time hearing something like that." Alice testified that she did not believe hospital personnel when they informed her that they also found healing fractures on Darren. Alice stated that she did not abuse any of her children and that she did not know how Donna was injured. According to Alice, she took the children to their pediatrician four to eight weeks before Donna's hospitalization and the medical records did not

8

mention any rib fractures. Alice testified that child abuse charges have never been brought against her, and no pediatrician had ever reported Alice to CPS for child abuse.

According to Alice, she had previously brought Donna to Children's Memorial Hermann Hospital in October 2020 after Alice had picked Donna up from daycare and noticed that Donna was limping and had a knot on her leg. Alice testified that the daycare did not have accident reports for Donna's scratches, and on another occasion, when Alice picked Donna up and questioned the daycare about a dark area under Donna's eye, the daycare did not have an accident report and the daycare said Donna probably fell. According to Alice, Darren did not have problems at that daycare but only had "scratches and things like that" but not "to the severity of [Donna]." The day of the incident with Donna's leg in October was Donna's last day at that daycare, and Alice moved the children from that daycare to another daycare. Alice testified that she had not had any concerns with the new daycare, and she did not believe the children had been injured there.

Alice testified that at the October 2020 hospital visit, Donna was diagnosed with a hematoma on her leg and severe anemia, and "[t]hey wanted to transfuse her." Alice agreed that Donna suffered from anemia that caused her to be fatigued and lethargic, and Donna was prescribed iron drops and a modified diet.

Alice believed that Donna's injuries were caused by a "[m]ixture of day care and the process of her being resuscitated[,]" and that it was the hospital's and daycare's fault. Alice agreed that she did not ask the hospital if Donna's resuscitation could have caused her injuries, and Alice admitted that she had not filed a lawsuit against the Hospital. Alice testified that she did not believe Anthony caused Donna's injuries and did not know if he had charges brought against him. Alice denied ever witnessing Anthony lose patience or use any type of corporal punishment against any of her children, and she said he had never been confrontational or physically violent against her. According to Alice, if Anthony had done so, she would have ended the relationship, and if he ever used violence against her children, she would have called the police. Alice also denied that her older son Leon had ever told her that Anthony hit him. Alice said she was not aware that Anthony had bond conditions that prohibited contact with her, and when asked if she thought that it was important for her to know for her children's safety, she responded, "It hasn't been brought to my attention. This is the first time I'm hearing this today." She testified that the last time she spoke with law enforcement they left a voicemail with her mother that they were closing the case, but Alice never asked them the status of the charges against Anthony because "it's not [her] case." She denied that there was ever any physical violence between her and Anthony, and when questioned about one occasion when he knocked out her car window, she explained that it was because Donna got locked

10

inside the vehicle and they were not aware they could call 911 for first responders to come open the door. She agreed that Donna and Darren were left alone with Anthony briefly when she had to go to the grocery store. She also agreed that when she was interviewed by the detective in this case about what happened, she had Anthony listening on her cell phone. When asked if she was aware of Anthony's criminal history, she testified that he had "[s]omething back in 2010" that "involv[ed] money or something." Alice testified that she continued to reside with Anthony through the end of December 2020 and into January 2021 until they broke up, and that they broke up because she was pregnant and focusing on herself and not because she felt he injured her children. According to Alice, Anthony had been involved with their child, Andy, "[s]poradically[,]" and her last communication with Anthony was via FaceTime several months before trial. She testified that Anthony was most recently at her residence in July, when he was dropping off gifts for the baby with his sister.

Alice testified that her plans for the children if they were returned to her was "[a] lot of counseling [and] [a] lot of making up for lost time." Alice named several relatives as possible placements if the children were not returned to her. According to Alice, her children were loved, and she wanted them to come home and participate in counseling, and she believed there should not "even be an option for unrelated adoption when they have family." Alice asked the trial court not to terminate her

parental rights because she "went above and beyond proving that [she's] willing to do whatever[,]" her children were loved and deserve to be at home, and she had social workers and family willing to help her.

Testimony of Department Caseworker

A Department Caseworker testified that she was the caseworker assigned to the case and she had been the caseworker since the beginning of the case. The Caseworker testified that her last contact with Derek, the alleged father of Donna and Darren, was in October 2021, a few months before trial, when she went to Derek's residence to see if he wanted to take the children. According to the Caseworker, Derek was back and forth between Louisiana and Texas and had no knowledge of the twins. Derek had not been confirmed by DNA to be Donna's or Derek's father, no one else had been alleged to be their father, and no one had contacted the Department claiming to be their father.

The Caseworker testified that a criminal investigation of the injuries to the children resulted in a warrant for Anthony's arrest. However, when the Caseworker had a conversation with Alice about who might have caused the injuries, Alice said it was the daycare. The Caseworker had concerns because of the severity of the injuries to the young children and because Alice had not given any indication of the cause of the injuries except that the daycare or the hospital caused them. The

Caseworker testified that Donna had been hospitalized for about two weeks after her injuries, and Alice did not visit Donna during that time.

The Caseworker testified that the services that were court-ordered for Alice included parenting classes, a collaboration group, individual counseling, a psychological evaluation, and an empowerment class. According to the Caseworker, Alice did not complete the personal empowerment class, did not provide verification that she completed the individual counseling, and did not provide proof of employment or residency. Alice was granted visitation one hour a week, and during those visits Alice was nurturing to the children, did not appear to be a danger to the children, and the children were happy to see Alice and bonded with her.

The Caseworker stated that she requested that Alice communicate with her every month. But Alice had not maintained regular contact with her. The Caseworker had no contact with Alice between December 2020 and March 2021; she met with Alice on March 5, 2021, when Alice signed her family plan of service; and, after that all communication was via email. The Caseworker testified that during the time Alice was not communicating with the Department, she never told the Department that it was due to being pregnant or any other medical condition. According to the Caseworker, Alice's visits were initially at Alice's mother's house, where the children were placed during that time, and later the visits were at the Department office. In March of 2021, a safety plan was established between Alice, Alice's

mother, and the Department as a result of allegations from the daycare as well as the school that Alice was having unsupervised visits with the children. The children were removed from the maternal grandmother's house on June 25, 2021, because "she was not keeping the kids safe [and] violated a safety notice that was put into place."

According to the Caseworker, Alice was uncooperative throughout the entire case. The Caseworker attempted to contact Alice, but Alice had changed her phone number without telling the Caseworker. The Caseworker also attempted to visit the residence Alice had listed when she signed up for services, but the Caseworker learned Alice did not have a lease at that apartment complex. The Caseworker went to the other residence Alice had listed and then located Alice as she was leaving the residence with her mother and the children. The Caseworker testified that on March 25, 2021, she found the children, and they had been left with Alice unsupervised.

The Caseworker testified that the Department's initial plan for Donna and Darren was reunification with Alice, but that changed after Alice was not in contact with the Department or her children for four months. The Caseworker investigated relative placement for the twins, but neither of the home studies on Alice's stepbrother nor sister had been approved by the time of trial. The permanency plan for the children then changed to unrelated adoption with a concurrent goal of relative adoption by their current foster parents. Donna and Darren had been in foster

placement for almost a year by the time of the trial. The foster parents were licensed to adopt and wanted to adopt Donna and Darren if parental rights were terminated. According to the Caseworker, Donna had special needs and participated in occupational, speech, and physical therapy. Donna was developmentally delayed due to the brain injury and was still learning how to walk. The Caseworker had no concerns with Donna's and Darren's current foster placement.

The Caseworker was concerned about Anthony being in the children's lives and about their safety if they were around Anthony. The Caseworker believed that Anthony was physically abusive to all the children in Alice's care, and she said that she believed that Alice was aware of the physical abuse. The Caseworker also expressed concern as to whether Alice would be protective of the children around other people like Anthony. The Caseworker had "safety concerns" because Alice and her mother did not follow the rules early in the case and the children had to be moved from their maternal grandmother's home. According to the Caseworker, this was an indication that Alice did not follow the rules nor think there was a problem, which suggested a higher level of risk. The Caseworker testified that Alice had five children, including a baby, and there were four different fathers. The Caseworker also noted that Leon, the oldest child, did not want to have visits with Alice and he had since been placed elsewhere. According to the Caseworker, in terms of this case and the severity of young children's injuries, it caused her even greater concern that

15

they were not going to have an older sibling to help them out. The Caseworker testified that she was concerned that Anthony was still around Alice, and while Anthony was still being investigated, a vehicle registered to him was located at Alice's apartment as recently as July 2021. The Caseworker agreed that now that Alice shared a child with Anthony, there was more reason for him to come around.

In the Caseworker's opinion, termination of Alice's parental rights as to Donna and Darren was in their best interest. Donna and Darren were safe in their current placements, and the Caseworker believed placement with the foster family was in Donna's and Darren's best interest.

Testimony of the Court Appointed Special Advocate (CASA)

The CASA testified that he was assigned to the case from the beginning and visited with Donna and Darren at least monthly, sent them cards, attended visits where the children got together, and attended supervised visits between the children and Alice. The CASA also visited with the oldest child, Leon, prior to Leon's case being severed. The CASA explained to the trial court that when he was visiting Leon in the foster parents' home, Leon made spontaneous, unprovoked outcries to the CASA telling the CASA that Anthony had physically abused Leon. The CASA testified that Leon also chose not to continue visits with Alice. The CASA believed termination of Alice's parental rights was in the best interest of Donna and Darren and the CASA had concerns for the safety of the children because they had severe

16

unexplained injuries. The CASA explained he observed that Donna and Darren were bonded with their mother, were not scared of her, and she did not appear to be abusive towards them. The CASA was not aware of Alice being criminally charged with any child abuse regarding Donna or Darren. The CASA was concerned that if the children were returned to Alice, even if the person believed to have caused the injuries was no longer present, similar injuries could still be caused by that same individual or other individuals. According to the CASA, Donna and Darren were doing very well in their current placement.

Other Evidence

The trial court took judicial notice of its file. Alice's court-ordered service plan was part of the trial court's file and it was also admitted into evidence. A Notice of Filing Business Records Affidavit was timely filed with the clerk prior to trial, and the affidavit included 4526 pages of medical records for medical care Donna received from Texas Children's Hospital. The medical records on Donna were admitted into evidence as part of Petitioner's Exhibits 6 and 7. The trial court also admitted Respondent's Exhibit 14, which included some medical "well care" visits and shot records on Darren. Donna's medical records indicated that on December 19, 2020, Donna was presented to the hospital in "cardiac arrest," she had facial bruising on the initial encounter. A skeletal survey that was done after she was resuscitated showed "multiple healing rib fractures at least 4-6 weeks of age"

17

bilaterally, the rib fractures were described as "healing posterior rib fractures," and the records described a "probable healed nondisplaced fracture of the right femur," a "liver laceration," and other conditions. One of the documents in Petitioner's Exhibits 6 and 7 included the "Physician's Statement of Injury to a Child," wherein the ER physician stated Donna's injuries were the result of "NTI" which was later explained in the records to be "[n]on-accidental traumatic injury to child." In the Physician's Statement the Physician also states that the child's injuries were not consistent with the explanation given by Alice, but the injuries were consistent with "abuse/neglect." An MRI of the brain taken on December 21, 2020 also showed some edema in the soft tissues of the brain. Other conditions noted during Donna's treatment included respiratory failure requiring intubation, pulmonary contusion, encephalopathy, impaired balance, seizures, acute urinary retention, and urinary tract infection.

Issues

Appellant raises six issues on appeal. In her first two issues, she argues the evidence is legally and factually insufficient to support the trial court's finding of condition endangerment and conduct endangerment, the predicate grounds for terminating a parent-child relationship under subsections 161.001(b)(1)(D) and (E). In issue three, Alice challenges the legal and factual sufficiency of the evidence to support the trial court's finding that terminating Alice's parental rights was in the

18

children's best interest. In issue four, Alice argues the trial court erred when it appointed the Department as the children's permanent managing conservator. In issue five, Alice argues her court-appointed trial counsel provided ineffective assistance. And, in issue six, Alice argues the trial court abused its discretion when it admitted the medical records from Texas Children's Hospital because the records did not fall under a hearsay exception under Rules 803(6) or 902(10) of the Texas Rules of Evidence and because "the trial was finished."

## Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code, "'[c]lear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex.

19

2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved the disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* In cases tried to the bench, the trial court in its role as factfinder determines the credibility and weight of the witnesses' testimony and resolves any inconsistencies or conflicts in the evidence. *See Webb v. Crawley*, 590 S.W.3d 570, 578 (Tex. App.—Beaumont 2019, no pet.); *In re R.J.*, 568 S.W.3d 734, 754 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). Only one statutory ground under section 161.001(b) is required to terminate parental rights. *See In re Z.M.M.*, 577 S.W.3d 541, 542 (Tex. 2019). "All evidentiary standards, including clear and convincing evidence, recognize the relevance of circumstantial evidence."

20

*In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015); *see also In re R.H.W. III*, 542 S.W.3d 724, 734 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

Statutory Grounds D and E

In her first two issues, Alice argues the evidence is legally and factually insufficient to support the trial court's finding of "condition endangerment" and "conduct endangerment," the predicate grounds for terminating a parent-child relationship under subsections 161.001(b)(1)(D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). While similar, the subsections are not identical. Under subsection D, the Department had the burden to prove, by clear and convincing evidence, that Alice knowingly placed or allowed Donna and Darren to remain in conditions or surroundings that endangered their physical or emotional well-being. *Id.* § 161.001(b)(1)(D). Under subsection E, the Department had the burden to prove, by clear and convincing evidence, that Alice knowingly placed Donna and Darren with a person or allowed them to remain in a condition with a person who engaged in conduct that endangered Donna's and Darren's well-being. *Id.* § 161.001(b)(1)(E). Under either subsection D or E, the term endanger means "expose to loss or injury; to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting "endanger," Webster's New Twentieth Century Dictionary of the English Language 599 (1976)). Generally, a parent's conduct that subjects a child to a life of uncertainty and instability endangers a child's physical and emotional well-

21

being. *See In re J.O.A.*, 283 S.W.3d at 345 n.4 (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

"Subsection D requires the endangerment to the child to be the direct result of the child's environment." *See In re J.H.*, No. 09-20-00056-CV, 2020 Tex. App. LEXIS 6189, at *34 (Tex. App.—Beaumont Aug. 6, 2020, no pet.) (mem. op.) (citation omitted). "Endangerment under subsection (D) arises from a child's environment and a parent's disregard for the potential for danger created by the environment." *In re I.V.H.*, No. 01-19-00281-CV, 2019 Tex. App. LEXIS 8659, at *14 (Tex. App.—Houston [1st Dist.] Sept. 26, 2019, pet. denied) (mem. op.) (citation omitted). We consider the child's environment before the Department obtained custody in our subsection D endangerment analysis. *See In re J.L.V.*, No. 09-19-00316-CV, 2020 Tex. App. LEXIS 2070, at *34 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.). Under subsection D, termination may be based on a parent's single act or omission. *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied). It is unnecessary that a parent know with certainty the child is in an endangering environment; instead, awareness of the potential for danger and disregarding the risk is enough to show endangering conduct. *See In re J.H.*, 2020 Tex. App. LEXIS 6189, at *35. To terminate a parent's rights under subsection E, the evidence must "show a conscious course of conduct." *In re C.M.C.*,

22

554 S.W.3d 164, 172 (Tex. App.—Beaumont 2018, no pet.) (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)).

The medical records show that Donna's and Darren's injuries were consistent with physical abuse having occurred on more than one occasion. The medical records demonstrated that during Donna's hospitalization in December 2020, she had cardiac arrest, respiratory failure requiring intubation, a pulmonary contusion, encephalopathy, facial bruising, liver laceration, multiple fractures of ribs, seizures, acute urinary retention, and urinary tract infection. The medical personnel characterized Donna's injuries as "[n]on-accidental traumatic injury to child."

Alice admitted that on occasions she left Donna and Darren alone with Anthony. The trial court heard testimony that just prior to Donna arriving unresponsive at the hospital, Alice had put Donna in the crib at the foot of the bed near Anthony, who was playing video games. The trial court heard Alice's testimony that she awakened to Donna having difficulty breathing and Donna was limp and would not open her eyes. Despite Alice's testimony that she believed Donna's injuries could have resulted from the daycare she had last attended months prior to her hospitalization or from being resuscitated at the hospital, the trial court had medical records evidence that Donna arrived at the hospital in cardiac arrest, that Donna's injuries were characterized as "[n]on-accidental traumatic injury to child[,]" and were consistent with "child abuse" and showed multiple fractures in

23

various stages of healing. The affidavit attached to the Petition noted that a doctor had informed the Department that Donna's rib fractures were inconsistent with being caused by the act of CPR and that the nature of the levels of fracture suffered by Donna indicated "a strong possibility of abuse[.]" The trial court heard testimony where Alice admitted she did not ask the hospital if Donna's resuscitation could have caused her injuries, and that the hospital's skeletal survey on Darren also showed he had rib fractures in different stages than Donna's fractures. The trial court heard Alice testify that she was not sure what caused Donna's or Darren's injuries. Additionally, the trial court took judicial notice of the file which also contained a summary of the allegations of abuse made by an older sibling, Leon. The CASA testified that Leon outcried to him and described that Anthony had physically abused Leon, and that Leon had chosen to stop having visits with Alice. The trial court heard the Caseworker's testimony that Anthony was investigated regarding the children's injuries and there was a warrant for his arrest. The trial court heard Alice testify that she did not believe Anthony caused the injuries to Donna or Darren, and further that she did not inquire into the status of the charges against Anthony because "it was not [her] case." The trial court also heard Alice admit that when she was interviewed by the detective in this case, she had Anthony listening on her cell phone. The trial court also heard the Caseworker testify that: Alice was uncooperative during the case, the Caseworker had concerns about Anthony being in the children's lives and

24

concerns about their safety around Anthony, the Caseworker was concerned that Anthony was physically abusive to all the children in Alice's care, and that she had reason to believe that Alice was aware of the physical abuse.

A child's unexplained, non-accidental fractures of various ages support a reasonable inference that the child's caregivers knew of the injuries and their cause, and supports termination under subsection D. *In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005); *see also C.H. v. Tex. Dep't of Family & Protective Servs.*, 389 S.W.3d 534, 541 (Tex. App.—El Paso 2012, no pet.) (finding sufficient evidence under subsection D where parents denied knowledge of the child's multiple fractures and did not know how the fractures occurred).

The Supreme Court of Texas in *In re J.P.B.* reviewed similar evidence of physical abuse as presented here, including that the father was with the mother and child during the period the fractures likely occurred, the child sustained multiple fractures when under the father's care, and the fractures were likely caused by abuse and did not occur all at once. 180 S.W.3d at 574. Based on this evidence, the Court found the evidence was legally sufficient to allow the jury to reasonably infer that, although the father sought medical care, he knowingly allowed the child to remain in an environment that endangered his physical well-being as required under subsection D. *Id.* The Court also concluded that it was within the fact finder's

province to judge the father's demeanor and to disbelieve his testimony that he did not know how the child was injured. *Id.*

Similarly, in *C.H. v. Tex. Department of Family & Protective Services*, the parents took the child to the hospital, where it was discovered he had a broken leg, and the parents told the hospital that the leg simply "popped" during a diaper change. 389 S.W.3d at 537, 541. X-rays showed the child had suffered broken ribs, a prior fracture of the other leg, and the breaks were in various stages of healing. *Id.* at 541. The parents denied knowledge of the other injuries or how they occurred, tests ruled out brittle bone disease or any other such condition, and the child sustained no more broken bones while in foster care. *Id.* The court explained that the trial court was not required to believe the mother's testimony that she was unaware of the injuries and did not know how they occurred. *Id.*

As in *In re J.P.B.* and *C.H.*, the fact-finder in this case was free to make its own credibility assessments, resolve conflicts in the testimony, and decide what weight to give the witnesses' testimony. *See In re J.L.*, 163 S.W.3d at 86-87 (fact finder is the "sole arbiter when assessing the credibility and demeanor of witnesses[]"). The trial court could have believed based on the medical records that the injuries to Donna were non-accidental and consistent with child abuse. The medical evidence showed that both children had fractures showing multiple injuries in various stages of healing which suggested they were caused by physical abuse

26

inflicted at different times in the past. The trial court could have reasonably inferred that Alice knowingly allowed both Donna and Darren to remain in an environment that endangered their physical well-being and that she engaged in conduct that endangered their physical well-being. It was within the trial court's province to judge Alice's demeanor, to disbelieve her testimony that she did not know how Donna and Darren were injured, and to infer that she knew of their injuries and how they occurred, supporting its findings under both subsection D and E.

Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the findings under subsection D and E, as we must, the trial court could reasonably have formed a firm belief or conviction that Alice knowingly placed or allowed Donna and Darren to remain in conditions or surroundings that endangered their physical or emotional well-being and that Alice knowingly placed Donna and Darren with a person or allowed them to remain in a condition with a person who engaged in conduct that endangered Donna's and Darren's well-being. We conclude that the Department established, by clear and convincing evidence, that Alice committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, considering the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or

27

conviction that the findings under subsections D and E are true. *See In re J.F.C.*, 96 S.W.3d at 266. We overrule issues one and two.

## Best Interest of the Children

In issue three, Alice challenges the legal and factual sufficiency of the evidence to support the trial court's finding that terminating Alice's parental rights is in the children's best interest. Trial courts have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong presumption that the best interest of a child is served by keeping the child with his parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Fam. Code Ann. § 153.131(b). Prompt and permanent placement of a child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a). When determining the best interest of the child, a court may consider circumstantial and direct evidence, subjective factors, and the totality of the evidence, and evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d at 28; *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.).

The Family Code outlines nonexclusive factors to be considered in determining whether a parent is willing and able to provide a safe environment for a

child including: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and whether an adequate social support system consisting of an extended family member and friends is available to the child. Tex. Fam. Code Ann. § 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116.

The Texas Supreme Court has articulated several additional factors that may be considered when determining whether termination of parental rights is in the best interest of the child, including: the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent

29

that may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No specific *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

As to the grounds on which the trial court found Alice's rights to the children should be terminated, the medical records and the testimony discussed above allowed the trial court to conclude that Alice failed to protect Donna and Darren from risks that endangered their well-being when they lived in her home. Both children suffered unexplained injuries while in her care, injuries consistent with being abused. And after Donna was seriously injured, Alice did not visit Donna in the hospital for two weeks. After the Department removed the children from Alice's home, she did not follow the rules of the Department that restricted her to having supervised visits with her children, she was uncooperative during the entire case, and she did not communicate with the Department or her children for a period of

four months at one point in the case. The trial court heard the Caseworker and the CASA testify that terminating Alice's parental rights to Donna and Darren was in their best interest. Although Donna suffers from developmental delays, according to the Caseworker, she is receiving occupational, speech, and physical therapy in foster care. And according to the Caseworker, the Department has no concerns with Donna's and Darren's current placement, a placement where the foster parents desire to adopt Donna and Darren if the court terminates the parents' rights to them.

The trial court also heard the Caseworker testify about her concerns that Anthony is still around Alice, Anthony is under investigation by the Department, and a vehicle registered to him was seen in the parking lot at Alice's apartment. According to the Caseworker, now that Alice shares a child with Anthony, he has additional reasons to see Alice, which the Caseworker said raised concerns about returning the children to Alice considering that Donna had been seriously injured while in Alice's and Anthony's care. The trial court heard the Caseworker testify that Donna and Darren are safe in their current placement, that home studies for two of Donna's relatives had not yet been approved, and that the foster parents were licensed to adopt and intended to adopt Donna and Darren if the trial court terminated their parents' rights. The trial court also had before it the opinions of the Caseworker and the CASA, who testified that that terminating Alice's parental rights would be in the best interest of the children. The Caseworker also opined that

31

allowing the twin's current foster parents to adopt them would be in their best interest. As to Alice, the trial court heard Alice testify that she was employed, living in an apartment, planned on having the children participate in counseling if the court returned her children to her, and if not, she suggested the court should place them with some of her relatives.

Deferring to the trial court's determinations on witness credibility, the resolution of conflicts of evidence, and the weight to be given the testimony, we conclude the evidence supports the trial court's statutory and best interest findings. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307; *In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72. Accordingly, we overrule Alice's first two issues.

Appointment of Department as Permanent Managing Conservator

In issue four, Alice argues the trial court erred when it appointed the Department as the children's permanent managing conservator. Alice argues that evidence at trial supports that there were family members seeking placement, no factual evidence supported the Department being named the children's managing conservator, and that the only reason the Department was appointed was because Alice's parental rights were wrongfully terminated.

Conservatorship determinations are subject to review for abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). We will reverse the trial court's appointment of a managing conservator only if we determine it was arbitrary or

32

unreasonable. *Id.*; *In re N.T.*, 474 S.W.3d 465, 479 (Tex. App.—Dallas 2015, no pet.). The Family Code creates a rebuttable presumption that a parent will be named the child's managing conservator unless that court finds that such appointment would not be in his best interest "because the appointment would significantly impair the child's physical health or emotional development[.]" Tex. Fam. Code Ann. § 153.131(a).

As discussed above, sufficient evidence supports the trial court's order terminating Alice's parental rights.

When the parents' rights have been terminated, Family Code section 161.207 governs the appointment of a managing conservator. *See id.* § 161.207; *In re N.T.*, 474 S.W.3d at 480-81. Section 161.207(a) provides, "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a). We cannot conclude that the trial court abused its discretion by appointing the Department as the children's managing conservator. *See In re J.A.J.*, 243 S.W.3d at 616; *In re N.T.*, 474 S.W.3d at 480-81. We overrule issue four.

Ineffective Assistance of Counsel

In issue five, Alice argues her court-appointed trial counsel provided ineffective assistance. Specifically, Alice argues that her trial counsel was ineffective in failing to object to hearsay in Alice's service plan, hearsay in the child's medical records as entered on December 8, 2021, hearsay in the child's medical records as entered on December 10, 2021 when the evidence was reopened, hearsay in skeletal scan results, hearsay regarding Anthony's vehicle being parked at Alice's apartment, and failure to subpoena Anthony to testify. According to Alice, these were "serious and deficient errors" and the errors prejudiced her because there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

A parent who cannot afford to retain counsel in Texas parental-termination cases has a right to an appointed attorney who provides effective assistance. *In re D.T.*, 625 S.W.3d 62, 69-70 (Tex. 2021); *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003); *see also* Tex. Fam. Code Ann. § 107.013(a). Ineffective-assistance-of-counsel claims in parental-termination cases, as in criminal cases, are governed by the United States Supreme Court's two-prong test articulated in *Strickland v. Washington*. *In re M.S.*, 115 S.W.3d at 544-45 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). First, the parent must show that counsel's performance was deficient. *Id.* at 545. This requires showing that counsel made errors so serious that

counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* Second, the parent must show that the deficient performance prejudiced the case. *Id.* This requires showing that counsel's errors were so serious as to deprive the party of a fair trial—a trial whose result is reliable. *Id.*

In examining counsel's performance under the first prong, "we must take into account all of the circumstances surrounding the case, and must primarily focus on whether counsel performed in a 'reasonably effective' manner." *Id.* (quoting *Strickland*, 466 U.S. at 687). Counsel's performance falls below acceptable levels only when the "'representation is so grossly deficient as to render proceedings fundamentally unfair[.]'" *Id.* (quoting *Brewer v. State*, 649 S.W.2d 628, 630 (Tex. Crim. App. 1983)). We give great deference to counsel's choices and indulge "'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' including the possibility that counsel's actions are strategic." *Id.* (quoting *Strickland*, 466 U.S. at 689). The challenged conduct will constitute ineffective assistance only when "'the conduct was so outrageous that no competent attorney would have engaged in it[.]'" *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

In conducting the harm analysis under the second prong of *Strickland*, reviewing courts must determine whether there is a reasonable probability that, but for the deficient performance, the result of the proceeding would be different. *Id.* at

35

549-50. In this context, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, a parent must also show that "counsel's 'deficient performance prejudiced the defense[.]'" *In re J.O.A.*, 283 S.W.3d at 344 (quoting *Strickland*, 466 U.S. at 687).

An allegation of ineffective assistance of counsel in a termination proceeding must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness and the resulting harm. *In re L.G.R.*, 498 S.W.3d 195, 209 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). We may not speculate and find trial counsel ineffective when the record is silent regarding counsel's reasons for his actions. *In re Z.M.R.*, 562 S.W.3d 783, 794 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Alice bears the burden of demonstrating a reasonable probability that her parental rights would not have been terminated if not for her trial counsel's conduct. *See In re V.V.*, 349 S.W.3d 548, 559-61 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (op. on reh'g en banc).

Alice did not file a Motion for New Trial or other evidence as to the basis for counsel's reasoning for not objecting on the grounds she alleges and for not subpoenaing Anthony to testify. Because the record is silent as to the reasons for counsel's conduct, we may not speculate to find counsel's performance deficient. *See In re Z.M.R.*, 562 S.W.3d at 793-95; *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 623 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

36

Without evidence about strategic reasons for counsel's behavior, Alice fails to overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *See In re M.S.*, 115 S.W.3d at 545; *see also Strickland*, 466 U.S. at 689.

Even if Alice had met *Strickland*'s first prong, we conclude she has also failed to show that, but for counsel's alleged errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. As set forth in our analysis above, the trial court had sufficient evidence in the record to support its findings under section 161.001(b)(1)(D) and (E) and to support the trial court's finding that termination of Alice's parental rights was in the children's best interest. We overrule issue five.

Admission of Medical Records

In her sixth issue, Alice argues the trial court abused its discretion when it admitted the medical records from Texas Children's Hospital because she argues the records did not fall under a hearsay exception under Rules 803(6) or 902(10) of the Texas Rules of Evidence and because "the trial was finished." According to Alice, exhibits admitted as Petitioners Nos. 6 and 7 were hearsay and could only be admitted into evidence under the business record exception pursuant to Rules 803(6) or 902(10).

At the trial conducted on December 8, 2021, the Department offered Petitioner's No. 6, which it described as "a notice of the filing of the business records affidavit and records filed in this case September 2, 2021, from the Texas Children's Hospital." Alice objected to Petitioner's No. 6 on the basis that "[t]here are some inaccuracies in those records in - - with regards to there is another patient's name on page 30 and also on page 32[,] [s]o I would object to those two pages coming in or the entire exhibit as a whole." The trial court overruled the objection and admitted Petitioner's No. 6.

On December 10, 2021, the trial court orally rendered judgment, then in the same hearing withdrew its ruling because the trial court had not received one of the preadmitted exhibits, Respondent's No. 14. The trial court recessed for the exhibit to be presented to the trial court and for the trial court to review all the exhibits admitted and then render judgment later that day. After the recess, the same day the trial court stated on the record the following:

> So let me just start by saying a couple of things. Generally speaking, once everyone has rested and closed whatever evidence has been provided to the Court at that time is all that can be reviewed by the Court. But in this case, it appears that neither side provided the Court with all of the preadmitted, agreed upon exhibits in reviewable form.
> And so based on that, I'm going to reopen the evidence for the purpose of allowing both the petitioner and the respondent to ensure that all of your preadmitted exhibits are actually what each of you agreed upon and that they're properly in evidence in a reviewing form.
> So the main issue was with Respondent's No. 14 and Petitioner's 6. But since – in order to address the issues with Respondent's 14 and

38

Petitioner's 6, I have to reopen the evidence. I'm going to give both petitioner and respondent an opportunity to clear up any of the remaining issues with the agreed upon exhibits. So I think we need to go through and make sure that everything is in order.

The trial court went through the Respondent's exhibits, confirmed the trial court now had received Respondent's No. 14, confirmed that the Department had now reviewed the exhibit, and confirmed that the Department did not have any objections to the exhibit.

Next, when the trial court went through the Petitioner's preadmitted exhibits with the parties, the trial court brought to the parties' attention that Petitioner's No. 6, which appeared to be approximately forty pages of medical records, actually had a disc of over 4500 pages of medical records attached but it was password protected and not in a reviewable form. Respondent stated that as to the paper form of Petitioner's No. 6, it had been preadmitted, she was making "that same objection right now" and objected to page 30 and page 32, she objected to the 4500 pages of medical records as "just full of hearsay[,]" and she "would have objected to those records in their entirety if they would have been offered to me as an exhibit for purposes of trial." The trial court reiterated that Respondent had objected to the paper pages on hearsay grounds, the trial court had overruled those objections at trial, and the paper records were admitted at trial. The Department argued that when the medical records were offered, all 4526 pages of the records were filed with the trial court as business records and with the business records affidavit which was offered

39

as part of Petitioner's No. 6 and listed as a trial exhibit, and that the forty "paper" pages were just the pages the Department referred to in its argument because the Department was not going to make paper copies of the complete voluminous medical records. The Department argued that its intent was that all 4526 pages would be admitted as Petitioner's No. 6 because they had been filed with the court and accessible for Respondent's counsel to review. The trial court pointed out that the disc provided to the court was not in reviewable form, but that it had now reopened the evidence, and the trial court renamed the entirety of the medical records pursuant to the business records affidavit as Petitioner's No. 7 and asked Respondent's counsel if she had any objections to the exhibit. Respondent's counsel explained that her perception was that only the forty "paper" pages were being offered and admitted as Petitioner's No. 6 and she lodged the following objection as to Petitioner's No. 7:

> Yes, Your Honor. I'm going to object to P-7 based on it being full of hearsay statements, Judge. It's so many different signatures in that document, so many different statements in that document to where I would have to object to P-7 coming in because, you know, as I stated before, that's not what I received as the intended exhibit to be used at trial. So, you know, I would have to object to P-7 coming in at this point.

The trial court then recessed until a later date to allow Respondent to review the entirety of the medical records offered as Petitioner's No. 7. On January 12, the proceedings resumed, and the trial court asked Respondent if she objected to Petitioner's No.7. Respondent's counsel objected to the exhibit on the grounds that

she was not served with the 4500 pages the day before the trial and she was only served with the excerpt of the medical records. Counsel for the Department responded that such objection was not made at the time the Department filed and served the summary of exhibits that included "the excerpt which I had on here referring to the business records specifically stated notice of filing of business records affidavit for Texas Children's Hospital filed September 2nd, 2021, . . . with 4,526 pages of records."

The trial court took judicial notice of the court's entire file and noted that there was a notice of filing of business records affidavit for Texas Children's Hospital with 4526 pages in the file. Respondent's counsel conceded that she had received the notice on September 2, 2021, and that she had not filed any objection because she relied on the physical documents she had been presented. The trial court noted on the record that on December 13 the trial court recognized the confusion, reopened the evidence for the exhibit to be clarified, and allowed Respondent's counsel time to review Petitioner's No. 7 for any objections. The trial court also noted on the record that the proceedings were resumed on January 12 and the trial court was overruling the objections and admitting Petitioner's No. 7, the medical records described in the business records affidavit filed with the trial court on September 2, 2021. The trial court stated it would render judgment no later than January 18.

As for Alice's argument that the trial court abused its discretion in admitting Petitioner's No. 6 and No. 7 because they were hearsay that did not fall under a hearsay objection under Rules 803(6) or 902(10) of the Texas Rules of Evidence, Alice made a blanket hearsay objection. A blanket hearsay objection that does not identify which parts of a document contain hearsay is not sufficiently specific to preserve error with respect to those parts. *Flores v. City of Liberty*, 318 S.W.3d 551, 560 (Tex. App.—Beaumont 2010, no pet.); *see also* Tex. R. App. P. 33.1.; *Speier v. Webster Coll.*, 616 S.W.2d 617, 619 (Tex. 1981) ("A general objection to a unit of evidence as a whole, . . . which does not point out specifically the portion objected to, is properly overruled if any part of it is admissible."). As for Alice's statement on appeal that the trial court abused its discretion in admitting the medical records because "the trial was finished[,]" she has failed to brief this argument. *See* Tex. R. App. P. 38.1(i). We overrule issue six.

We affirm the trial court's order of termination.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 7, 2022
Opinion Delivered July 28, 2022

Before Kreger, Horton & Johnson, JJ.